# IN THE COURT OF APPEALS OF IOWA

No. 17-0157
Filed April 19, 2017

**IN THE INTEREST OF S.G. and J.G.-P.,**
**Minor children,**

**S.P., Mother,**
    Appellant.

_____

Appeal from the Iowa District Court for Woodbury County, Mary L. Timko, Associate Juvenile Judge.

The mother appeals from the juvenile court's order terminating her parental rights to her children. **AFFIRMED.**

Zachary S. Hindman of Mayne, Arneson, Hindman, Hisey & Daane, Sioux City, for appellant mother.

Thomas J. Miller, Attorney General, and Gretchen Witte Kraemer, Assistant Attorney General, for appellee State.

Joseph W. Kertels of Juvenile Law Center, Sioux City, guardian ad litem for minor children.

Considered by Potterfield, P.J., and Doyle and Tabor, JJ.

**POTTERFIELD, Presiding Judge.**

The mother appeals from the juvenile court's order terminating her parental rights to her children, J.G.-P. and S.G., born in 2010 and 2012, respectively.[1] The mother maintains there was not clear and convincing evidence the children could not be returned to her care at the time of the termination hearing and termination is not in the children's best interests.

**I. Background Facts and Proceedings.**

The Iowa Department of Human Services (DHS) and the juvenile court first became involved with this family in 2011, when the mother—then sixteen years old—was adjudicated delinquent for committing the acts of interference with official acts and minor in possession of alcohol. J.G.-P. was already almost one year old, and soon thereafter, the mother became pregnant with S.G. The mother was struggling with her mental health and was having difficulties in her relationship with the children's father. At the time, the mother lived with her mother, who was also lacking stability and appeared to have difficulty providing for the basic needs of the mother and her siblings.

S.G. was born in June 2012, and both children were adjudicated children in need of assistance (CINA) in October 2012.

The mother received and engaged in some services, including finding a home for the family, working toward a high-school-equivalent degree, and learning parenting and planning skills. The children remained with their parents and they appeared to be healthy and well cared for.

---

[1] The father's parental rights were also terminated. He does not appeal.

At a dispositional review hearing in February 2014, the mother reported to the court that she had ended her relationship with the children's father because she suspected he was using illegal drugs again. At the time, the mother was not employed and had not been attending school. The court indicated that over the next six months, it expected the mother to continue to seek employment, complete her education, maintain stability in her housing, and provide medical-insurance coverage for the children.

The State filed an application for removal in July 2014, claiming the mother had been avoiding contact with DHS and had been driving without a license. The mother had apparently moved to California with the children without telling DHS or the court, and it had been a number of months since she had made contact.[2] Both children were removed from the mother's care and placed in the custody of DHS for placement in foster care on August 12, 2014.

In the months following the children's removal from her care, the mother was inconsistent in attending visits with the children. She reported she did not have a job, admitting that she lost it because she "just stopped going." Additionally, the mother blamed the department for removing her children and stated she "needed her children back to keep her out of trouble." The mother did not have housing of her own, and she was not receptive to admonitions from the court reminding her of things she needed to do to have the children returned; the

---

[2] At the termination hearing, the mother continued to maintain that she went with the maternal grandmother on a visit to California so the children could meet their great-grandparents. The mother maintained she always intended to return to Iowa with the children. When she was asked why she applied for benefits in California, the mother claimed she did it because her mother told her to.

mother maintained she had done everything she needed to do. At a dispositional review hearing in February 2015, the court stated it

> needs to see honesty and consistency from [the mother]. The court needs to see [her] being on time for every visit. The court needs to see [the mother] achieving employment as well as diligently and consistently working on her GED. The court needs to find that [she] has maintained stability in her housing situation in that she is the only one residing in that home and that no one else, including any other family members besides [J.G.-P.] and [S.G.], stay in that home overnight or reside therein. The court needs to have verification that [the mother] is able to provide medical coverage for the children and their medical and dental needs are met.

In July 2015, the mother admitted to being pregnant with her third child. At a hearing, the court noted that she failed to return phone calls or texts from service providers, missed visits, and remained unemployed. Also, the court noted the mother had been receiving services for a number of years, and found, "[The mother] is unable to demonstrate much stability in her own life. At this point, the case is ripe for a permanency hearing."

A permanency hearing took place in October 2015, and the court noted the mother had made "remarkable progress in her willingness to accept guidance and make the necessary changes to follow through with the family case plan and expectations." The mother had located new housing, was working part-time, participating in a program to learn job skills, and making strides in completing her high-school-equivalent degree. The mother had also been consistent with her visits with the children and demonstrating parenting techniques she had learned. Because of the progress she had made, the State, guardian ad litem (GAL), and DHS social worker all agreed the mother should be given additional time to work toward reunification. Still, the juvenile court warned the mother that, "given the

history of this case, this would be the last opportunity she may have to have the children placed with her." Visitations were supposed to begin increasing time spent in the mother's home.

Also in October 2015, the mother gave birth to her third child by cesarean section.[3] The mother got a very serious infection following the procedure, and she was largely unable to comply with the service plan until mid-December 2015.

Still, in mid-January 2016, the children began a transition plan, where the children were to go to daycare at the foster family's during the day and then stay at the mother's home at night. However, the mother did not take the children to the foster parents' home; instead, she kept the children home with her and she missed school. Due to her absences, she was discharged from the educational program. In mid-February, a service provider made an unannounced visit to the mother's house, and a man was sleeping on the mother's couch. It appeared to the provider that the man was living in the mother's apartment because what appeared to be the man's clothing was in the living room. The mother was not supposed to have anyone else living in the home with her and the children. The mother admitted the man was the father of her youngest child, but she maintained he was not living with her and never had. Additionally, around the same time, DHS learned the mother had not been taking the children to their therapy appointments while they were in her care. A few days later, on February 16, 2016, DHS removed the children from the mother's care for the second and final time. According to the social worker, when the children were removed, S.G. expressed she was afraid at the mother's house and asked the worker to call the

---

[3] This child is not at issue in this appeal.

foster mother. J.G.-P told the worker he had wanted to see his foster mother but his mother would not take him there.

The mother filed a motion entitled, "Motion to Return Children to Mother" on March 9, 2016. In it, she maintained there was not sufficient or adequate reason for the children's removal from her care by DHS. She argued the children should be allowed to bond with their new sibling.

In March, when the worker was talking to the children, S.G. described "bad people" as the man that hit and was mean to her mother. J.G.-P. stated that a man and woman hit his mother using their hands and his mother had pushed them out the door and locked it. The children also told the therapist about a "scary man that came and yelled and stole things." At the termination hearing, the mother testified the youngest child's father "was being disrespectful, so [she] told him to get out. . . . [A]nd [she] just gave him all his stuff and told him don't come back anymore. [She] kicked him out." When the mother was then asked again if the man had been living or staying with her, she stated he "never does" but she gave him "[w]hatever he had. The little things, like his shirts and his backpack that he carried."

At the April 2016 permanency review/modification hearing the mother's motion was considered. Additionally, the social worker reported the children were suffering emotionally due to continued visits with the mother. The worker requested that the visits be left to the discretion of DHS, the GAL, and the children's therapist. The court found the request was reasonable and ordered future visits to be discretionary.

In May, the social worker stopped by the mother's home, and the mother refused to let her into the apartment. The social worker believed that she smelled drugs coming from the apartment, and the mother was asked to submit to drug testing. The mother refused. She later testified that she had not been doing drugs and explained her refusal by stating that she did not believe DHS had the right to ask her to test.

The State filed the petition to terminate the mother's rights to J.G.-P. and S.G. in June 2016. The termination hearing took place over three days, one each in July, September, and November 2016.

At the July hearing, the mother testified that she had not been to therapy in a number of months, and she no longer believed she needed it because she was not "sixteen years old anymore." She was two weeks into her third job of the year, and her testimony about those jobs—where she was employed, when, and for how many hours—was at odds with her testimony at earlier hearings. The mother was no longer pursuing her high-school-equivalent degree. The children's therapist also testified. She stated that the children appeared to be bonded with their mother but not attached. She explained the distinction as follows:

> A bond is generally described as having that—that caring feeling about somebody that you have been close with, like a parent to a child or, um, a parent to a family member, a child with a family member, a child with a sibling. Attachment is more developed over time as in having their needs met. A child will go to a person that they are attached with to get basic needs met.

The therapist also reported that in a recent session—since the children had returned to the foster parents' home—S.G. had indicated she was sad and did

not want to leave her foster mother, while J.G.-P. had indicated that he wanted to keep seeing his mother, but he wanted to live with the foster parents.

At the September hearing date, the mother had another new job that she was a "few weeks" into. She testified she was already planning on leaving that job for better paying employment elsewhere. She testified that she had lost her previous job after the July hearing date because she was sad and did not go to work. Since the previous hearing, she had started attending therapy again. She was not actively pursuing a high-school-equivalent degree, and she did not intend to restart the program anytime soon.

The juvenile court terminated the mother's parental rights to both children pursuant to Iowa Code section 232.116(1)(e) and (f) (2016).

The mother appeals.

## II. Standard of Review.

We review the termination of parental rights de novo. *In re D.W.*, 791 N.W.2d 703, 706 (Iowa 2010).

## III. Discussion.

The juvenile court terminated the mother's parental rights pursuant to section 232.116(1)(e) and (f). We may affirm the court's order on any ground we find supported by the evidence, *see D.W.*, 791 N.W.2d at 707, and here we consider whether the statutory grounds have been met under subsection (f). The mother maintains the State did not prove by clear and convincing evidence that the children could not be returned to her care at the time of the termination hearings. *See* Iowa Code § 232.116(f)(4); *see also In re C.B.*, 611 N.W.2d 489, 495 (Iowa 2000) ("At the time of the termination hearing, there was clear and

convincing evidence the children could not be returned to the care of [the parent].").

The mother maintains the children can be returned to her care; she focuses on the progress she has made since DHS first became involved with the family. We acknowledge the mother had made some progress, but we also note that DHS had been involved with the family for approximately five years at the time the mother's rights were terminated. The mother had still failed to meet a number of the goals established to improve stability for the children. The mother did not complete any of the educational programs in which she enrolled, and she had given up trying to obtain a high-school-equivalent degree. She had maintained the same home for over a year before the termination, but it also appeared she had allowed at least one other individual to live with her—in violation of the court's expectations. According to the mother's testimony, by September 2016, she had left three different jobs since January 2016, and she intended to leave her then-current employment as well. The mother lost at least one of the jobs because she "got sad" and quit going. This occurred almost immediately after the mother decided she no longer needed—and did not plan to attend—therapy. The mother maintained she was able to care for the children full-time, but when they were returned to her care for an "extended visit," the mother quit attending the education program in which she was enrolled, refused to take the children to daycare, and failed to take the children to their therapy appointments. Additionally, during that approximately three-week visit, the children witnessed a "scary man" who yelled at and may have struck the mother. The children were distressed enough by the event to tell both the social worker

and their therapist about it. The mother argues she is better equipped to care for the children than she was at the beginning of the case. But the statutory time period set by the legislature has passed; in fact, the children had been out of the home over two years by the last date of the termination hearing. *See* Iowa Code § 232.116(1)(f)(3) (setting the time period for the length of the time a child over four has been removed from their parents care at "twelve of the last eighteen months, or for the last twelve consecutive months and any trial period at home has been less than thirty days"); *see also C.B.*, 611 N.W.2d at 495 ("Once the limitation period lapses, termination proceedings must be viewed with a sense of urgency."). And we are still not confident the mother has the protective capacity or the stability to provide a safe home for the children.

The mother also maintains termination of her parental rights is not in the best interests of the children. The mother maintains she has a "powerful bond" with the children. As we noted above, as the children's therapist testified, the children did share a bond with their mother, but they were attached to their foster parents. At the time of the termination hearing, the children had lived with the foster parents for over two years—about half of S.G.'s life. Both children expressed to the therapist that they did not want to leave their foster mother, while J.G.-P had even expressed that he wanted to live with the foster mother and visit the mother. The children are bonded with the mother, but she cannot meet their needs regarding stability and permanency. Termination of the mother's parental rights is in the children's best interests. *See* Iowa Code § 232.116(2) ("The court shall give primary consideration to the child's safety, to the best placement for furthering the long-term nurturing and growth of the child,

and to the physical, mental, and emotional condition and needs of the child."); *see also In re J.E.*, 723 N.W.2d 793, 801 (Iowa 2006) (Cady, J., concurring specially) ("A child's safety and the need for a permanent home are now the primary concerns when determining a child's best interests.").

The mother has not argued that any of the permissive factors in section 232.116(3) weigh against termination of her rights, and we do not find that any are compelling. *See In re A.M.*, 843 N.W.2d 100, 113 (Iowa 2014) (stating factors are permissive, not mandatory); *see also In re P.L.*, 778 N.W.2d 33, 39 (Iowa 2010) ("Finally, before terminating a parent's parental rights, the court must consider if any of the [permissive factors] contained in section 232.116(3) allow the court not to terminate.").

We affirm the termination of the mother's parental rights to both S.G. and J.G.-P.

**AFFIRMED.**